# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Steven B. Cummings, an individual;
John Gardiner, an individual; John
Gardiner, as Custodian for Max A.
Gardiner; John Gardiner, as Custodian
for Paige M. Gardiner; John Gardiner,
as Custodian for Jake W. Gardiner;
David J. Gartner Profit Sharing
Account; Gregory T. Hegwood, an
individual; Blake Johnson, LLC, a
limited liability company; Bryant
Johnson, an individual; Peter Johnson,
an individual; Craig Mandery, an
individual; Joseph H. Ryan, an
individual; Sandra M. Ryan, an
individual; Ellen DaHaven (Peterson),
as the beneficial owner and real party
in interest of her Individual Retirement
Account; Joseph Dziedzic, an
individual; David J. Gartner,
as beneficial ow[n]er and real party in
interest of his Profit Sharing Plan;
David J. Gartner, an individual;
Stephen R. Gulbrandsen, as the
beneficial owner and real party in
interest of his Profit Sharing Plan; J.
Evan Johnson, as the beneficial owner
and real party in interest of his
Individual Retirement Accou[n]t; R.
Thomas Lane, an individual; Elizabeth
J. Lane, as the beneficial owner and
real party in interest of her Individual
Retirement Account; Mark R. Omlie,
husband; JoAnn Omlie, wife; Gregory
V. O'Toole, as the beneficial owner and
real party in interest of his Individual
Retirement Account; Guy M. Peterson,
as the beneficial owner and real party
in interest of his Individual Retirement
Account; Jeffrey M. Petrick, as the

Civ. No. 09-847 (RHK/JJK)

**REPORT AND
RECOMMENDATION**

beneficial owner and real party in interest of his Individual Retirement Account; Sally A. Petrick, as the beneficial owner and real party in interest of her Individual Retirement Account; Douglas M. Polinsky, as the beneficial owner and real party in interest of his Individual Retirement Account; Joseph H. Ryan, an individual; Sandra M. Ryan, an individual; Robert Spadafora, individual; Thomas C. Weekly, as the beneficial owner and real party in interest of his Individual Retirement Account; Daniel Welch, an individual as beneficial owner and real party in interest of his Individual Retirement Account; Daniel White, individually and as the beneficial owner and real party in interest of his Individual Retirement Accou[nt]; John Wilson, an individual;

Plaintiffs,

v.

Paramount Partners, LP; Crossroad Capital Management, LLC; John W. Lawton; Capital Solutions Management, LP; Capital Solutions Distributors, LLC; Charles T. Thompson; Timothy R. Redpath; and Michael W. Bozora,

Defendants.

---

George H. Frisch, Esq.; and Michael L. Puklich, Esq., and Patrick J. Neaton, Esq., Neaton & Puklich, P.L.L.P., counsel for Plaintiffs.

Joseph W. Anthony, Esq., and Steven M. Phillips, Esq., Anthony Ostlund Baer & Louwagie PA, counsel for Defendants Capital Solutions Management, LP, Capital Solutions Distributors, LLC, Timothy R. Redpath, and Michael W. Bozora.

Bryan R. Feldhaus, Esq., and Phillip A. Cole, Esq., Lommen, Abdo, Cole, King & Stageberg, PA, counsel for Defendant Charles T. Thompson.

---

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before the Court on Defendant Charles T. Thompson's Motion to Dismiss Second Amended Complaint (Doc. No. 27), and Defendants' Michael W. Boroza's, Timothy Redpath's, Capital Solutions Distributors, LLC's, and Capital Solutions Management, LP's, Amended Motion to Dismiss (Doc. No. 28). The case has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons that follow, this Court recommends that the motions be granted in part and denied in part.[1]

## BACKROUND[2]

## I. Introduction

In this case, Plaintiffs allege that Defendants are various individuals and entities affiliated with Paramount Partners, L.P. ("Paramount"), which is a limited partnership hedge fund. Paramount raised capital by selling limited-partnership

---

[1] These same Defendants previously filed motions to dismiss the First Amended Complaint. (Doc. Nos. 6, 9.) Because Plaintiffs have amended their pleading and interposed a Second Amended Complaint, and because Defendants have re-filed motions to dismiss Plaintiffs' later amended pleading, Defendants' earlier motions to dismiss (Doc. Nos. 6, 9), are moot.

[2] The facts in this background section are taken from Plaintiffs' Second Amended Complaint (Doc. No. 26), and the well pleaded facts therein are assumed to be true for the purposes of the current motions to dismiss only.

interests to investors, including Plaintiffs. Paramount told its investors that it would actively invest the funds received from their limited partnership investments in the stock market pursuant to a proprietary trading strategy designed to take advantage of stocks it believed would outperform or underperform the market.

Plaintiffs describe a network of business relationships between Defendants Paramount, Crossroad Capital Management, LLC ("Crossroad"), Lawton, Capital Solutions Management, LP ("CSM"), Capital Solutions Distributors, LLC ("CSD"), Timothy R. Redpath ("Redpath"), Charles T. Thompson ("Thompson"), and Michael W. Bozora ("Bozora"). Plaintiffs allege that these Defendants unlawfully sold unregistered securities, the Paramount limited-partnership interests, and made material misrepresentations and omissions in public advertisements and personal solicitations regarding those securities. According to Plaintiffs, Defendants represented Paramount to be a successful and well informed hedge fund and that Defendants closely monitored stock-market trends to engage in aggressive trading strategies that ensured a high return on its limited partners' investments. Plaintiffs say that, contrary to those and other representations, Paramount was not successful and the funds Plaintiffs believed to be investing in Paramount's trading activities by purchasing limited-partnership interests were not invested in the stock markets as Defendants represented they would be. Instead, those funds were allegedly misappropriated by one or more Defendants.

These events led to the Securities and Exchange Commission ("SEC")

launching an investigation of Defendants Paramount, Lawton, and Crossroad,

earlier this year, which resulted in the SEC filing a separate civil-enforcement

action.  In that SEC action, the District Court froze Paramount's assets.  (*See*

*Sec. and Exch. Comm'n v. Lawton, et al.*, Civ. No. 09-368 (ADM/AJB), Doc. No.

34, July 13, 2009 Order.)  In this case, Plaintiffs now seek repayment of the price

they paid for their limited-partnership interests in Paramount, statutory doubling

of those amounts, compensation for taxes they paid on the fraudulently reported

earnings their investments produced, with interest, and their attorneys' fees.

## II.    Factual Background

### A.    Paramount's Business Prior to July 12, 2006

In November 2001, Lawton organized a private hedge fund under the

name The Crossfire Trading Fund, L.P.  (Doc. No. 26, Second Am. Compl.

("SAC") ¶ 12.)  Lawton used the limited liability corporation Crossroad, as the

organizing entity for the Crossfire Trading Fund.  (*Id.* ¶ 3.)  On November 1,

2001, Lawton and Crossroad adopted a Limited Partnership Agreement in which

Crossroad became the general partner of the hedge fund and the "attorney-in-

fact" for all of its limited partners.  (*Id.* ¶ 14.)  It appears that, at the start, the

Crossfire Trading Fund was a one-man project, as Lawton obtained investors

through his personal contacts.  (*Id.* ¶ 12.)  On June 11, 2003, the name of the

hedge fund was changed from Crossfire to Paramount.  (*Id.* ¶ 13.)

Simultaneously with the name change, Lawton and Crossroad adopted an

amended limited-partnership agreement.  (*Id.* ¶ 14.)  At that time, Lawton, through Crossroad, allegedly "expanded the public solicitation of investors by means of internet advertisements containing false representations including, *inter alia*, [the representation that] '. . . [We conduct] fundamental research [and] . . . side visits with company management to develop a detailed understanding of each company's strategy and what drives its business.'"  (*Id.* (second and third alterations in original).)

From November 1, 2001, through July 12, 2006, Lawton, Crossroad, and the hedge fund (as both Paramount and The Crossfire Trading Fund), sold a total of only $928,636 limited-partnership interests to investors in the hedge fund.  (*Id.* ¶ 12.)

## B.    The Other Defendants Enter Paramount's Business in 2006.

Lawton entered into a new business relationship with the other Defendants in this matter in mid-June 2006.  (SAC ¶ 15.)  Pursuant to a July 12, 2006 agreement, CSM, which is founded and owned by Defendants Bozora and Redpath (*Id.* ¶¶ 7-8), and managed by Defendant Thompson (*Id.* ¶ 6), acquired a minority-ownership interest in Crossroad, the general partner of the Paramount limited partnership.  (*Id.* ¶ 15.)  Under that agreement, CSM initially owned 10 percent of Crossroad and "[f]or each $2,000,000 in new assets [Crossroad] t[ook] under management, [CSM] w[ould] own an additional 10 percent of [Crossroad] up to a maximum of 50 percent."  (*Id.* ¶ 16.)  In exchange for this ownership interest, CSM agreed to "advise and assist [Crossroad] in business planning,

business management, business development, and fundraising, and [Crossroad agreed to] pay [CSM] a monthly fee for services rendered." (*Id.*)

According to another July 12, 2006 agreement, CSD, which is an "'NASD member and wholly owned subsidiary of [CSM]'" (*Id.* ¶ 15), and managed by Thompson (*Id.* ¶ 6), agreed to be the "'exclusive distributor'" of Paramount's limited-partnership interests. (*Id.* ¶ 15.)  In this role, CSD would act as an exclusive sales agent by soliciting and referring prospective limited partners to Crossroad and Paramount. (*Id.* ¶ 6.)

After CSM, CSD, Thompson, Redpath, and Bozora became affiliated with Lawton, Paramount, and Crossroad, "public solicitation and sales of Paramount limited partnership interests increased dramatically, to the point that Paramount succeeded in the approximate 2-1/2 years from July 12, 2006 through December 2008, in obtaining $9,911,046 from investors who purchased Paramount's limited partnership interests[.]" (*Id.* ¶ 15.)  Prior to CSM, CSD, Thompson, Redpath, and Bozora's involvement, Paramount's sales of limited-partnership interests (including the sales of Paramount's predecessor) averaged approximately $16,500 per month. (*Id.*)  After these Defendants became involved with Paramount and its limited-partnership sales campaign, the hedge fund's sales increased dramatically to an average of over $300,000 per month. (*Id.*)

## C.    Statements and Representations to Plaintiffs

Beginning in 2002, investments in Paramount were solicited by use of a prospectus and through oral and written statements regarding the past

performance of the hedge fund.  (SAC ¶ 19.)  Defendants "emphasized

Paramount's purported successful hedge fund 'track record' by including both an

annual and monthly 'Performance History,' in a 'Marketing Sheet' that was

distributed by Defendant Crossroad on a monthly basis to [Paramount's] then

existing limited partners[.]"  (*Id.*)  They also distributed this information to

potential new investors as a "sales tool" to encourage investments.  (*Id.*)

### 1.    Documents Used to Solicit Investments

When CSM, CSD, Bozora, Thompson, and Redpath became involved with

Paramount in 2006, their sales efforts continued to focus on the use of "monthly

updated versions of this 'Performance History' to distribute both to [Paramount's]

then existing limited partners . . . and to solicit new investors."  (*Id.*)  These

Performance Histories included the following specific statements:

> The Fund [Defendant Paramount] will employ a proprietary trading
> strategy, based on 30 years of historical research, technical
> strategies, fundamental research to uncover sector and economic
> market inefficiencies. The Fund is dedicated to achieving absolute
> returns to increase our investor wealth regardless of market trends.
> The General Partner [Defendant Crossroad] believes with our
> experience and strong money management strategies the Fund can
> produce long term gains for our Limited Partners . . . .
>
> [Defendant Crossroad] provides professional portfolio management
> for high net individuals through its hedge fund. It was founded on the
> principal that systematic risks can be managed by hedging a
> portfolio to the current market environment . . . .
>
> [Defendant Paramount] is an opportunistic long/short equity trading
> fund. Extensive and deep electronic directional monitoring and
> analysis of market conditions and then (sic) same analysis of
> individual stocks are utilized to identify specific securities for
> purchase or sale. . . . Through our own research/due diligence

processes and relationships with research boutiques and regional firms. . . . We are constantly searching all research and other sources for ideas and then testing them to determine if they fit our industry and company criteria.  Then through electronic trend and directional analysis we determine if the particular stock is poised for a breakout or breakdown.  Only when all of the requirements are met does the name enter the portfolio.  Once in the portfolio, we monitor it closely to decide whether to add to the position if it is working as planned, remove it by way of our lost protection discipline, or let it run until it has reach (sic) our objective. . . . At the portfolio level, we are responsible for managing systematic risk, such as Beta, to make sure that we remain on target within risk tolerances.  At the position level, we are responsible for identifying position risks and helping to set core position sizes and Tactical Trading limits before establishing a position.  Research, Trading and Risk Management are defined by Portfolio Manager and include: specific exit triggers, stop loss triggers, and a detailed watch list of items that need to be continuously monitored during the life of a trade.

(SAC ¶ 19.)  Further, a May 2008 Performance History reported annual investment returns from Paramount's hedge-fund trading for the six previous years of 21.9% in 2002, 43.07% in 2003, -4.93% in 2004, 23.48% in 2005, 19.22% in 2006, and 64.7% in 2007.  (*Id.*)  This May 2008 Performance History also stated that Paramount's assets at the time totaled $12.68 million.  (*Id.*)

Plaintiffs assert that Defendants, through Thompson and CSM, sent an email to Paramount's limited partners and to potential investors on July 1, 2008, that purported to communicate a Bloomberg LP, Hedge Fund Universe ranking of Paramount's performance.  (SAC ¶ 19, Ex. E.)  The email explained that in May 2008, Bloomberg LP, an organization that ranks between 6,500 and 10,000 hedge funds each month, reported that Paramount was in the top 100 Bloomberg rankings for several years and in the top 50 for recent months.  (*Id.* ¶ 19, Ex. E.)

And in late November 2008, Paramount reported to its existing limited-partner investors and to potential investors that it had a "Net Performance" of 38.4% over the 11 previous months. (*Id.*)

Defendants also "offered and sold the limited partnership interests in Paramount to Plaintiffs by means of written prospectuses including Private Placement Memorand[a] dated November 1, 2001, June 26, 2005, and May 23, 2007." (SAC ¶ 20.)[3] As described in the Second Amended Complaint, these Private Placement Memoranda ("PPM") made similar representations for the purpose of soliciting potential investors. The November 2001 and June 2005 PPMs explained that Crossroad would use an "active trading strategy" to make investments in various securities based on how Crossroad believed they would perform. (*Id.* ¶ 21.) Crossroad would "hedge against unknown market risk" by holding onto a substantial portion of Paramount's assets in cash at the end of each trading day. (*Id.*) Crossroad's trading strategy would involve both "technical analysis" and "fundamental analysis." (*Id.*) The former, which was Paramount's primary strategy, involves tracking supply and demand rather than details about a particular "equity," while the latter involves evaluation of an

---

[3] The June 26, 2006 PPM and the May 23, 2007 PPM are attached to the Affidavit of Bryan R. Feldhaus. (Doc. No. 32, Aff. of Bryan R. Feldhaus ("Feldhaus Aff.") ¶¶ 3-4, Exs. 2-3.) For the purposes of these motions to dismiss, this Court considers these PPMs to be matters embraced by the Second Amended Complaint, and therefore properly addresses them without converting the dismissal motions to motions for summary judgment. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

individual security through measurement of its "intrinsic value." (*Id.*)  The May 23, 2007 PPM made substantially similar representations about the management of Paramount's investments.  (*See id.*)

Each PPM stated that Paramount primarily invested in companies with "market capitalization over $500 million for an initial investment."  (SAC ¶ 22.) Each PPM also represented that Paramount would use the proceeds obtained through the solicitation of limited-partner investments "in accordance with the policies set forth" in the description of the hedge fund's investment strategies, as set forth above.  (Feldhaus Aff. ¶ 4, Ex. 3 at 4.)

According to the PPMs, with respect to "Distributions," Crossroad "generally intends to reinvest all realized income and capital gains into additional [Paramount] investments rather than distribute such realized income and gains to [Paramount's] investing partners[.]"  (SAC ¶ 24; Feldhaus Aff. ¶ 4, Ex. 3 at 5.) This arrangement and Paramount's status as a partnership meant that each investor would be "subject to income tax on its proportionate share of [any] income and gains whether or not [Paramount] makes any distributions thereof." (SAC ¶ 24; Feldhaus Aff. ¶ 4, Ex. 3 at 5.)  Investors were permitted to make withdrawals from their "'Capital Accounts' on an annual basis," after giving Crossroad at least 60 days' written notice.  (SAC ¶ 25; Feldhaus Aff. ¶ 4, Ex. 3 at 5.)  But limited partners were generally not permitted any withdrawals within their first year of investing in the hedge fund, and they could not make withdrawals in amounts that would reduce their capital accounts below their initial investments.

(SAC ¶ 25; Feldhaus Aff. ¶ 4, Ex. 3 at 5.)  Crossroad could, in its discretion, deviate from these restrictions by permitting greater withdrawals or by requiring an investor to completely withdraw all of its funds.  (SAC ¶ 25; Feldhaus Aff. ¶ 4, Ex. 3 at 5.)  And the PPMs warned potential investors that additional restrictions could be placed on withdrawals and instructed them to "review the Partnership Agreement carefully before investing."  (SAC ¶ 25; Feldhaus Aff. ¶ 4, Ex. 3 at 5.)

The PPMs also stated that Crossroad would provide each investor with "monthly financial statements and performance information of [Paramount] and its operations.  Additionally, [Crossroad] will provide each Limited Partner with audited financial statements of [Paramount] as soon as practicable following the date they become available."  (SAC ¶ 26; Feldhaus Aff. ¶ 4, Ex. 3 at 8.)  The PPMs identified Virchow, Krause & Co., of Bloomington, Minnesota, as the independent certified public accounting firm chosen by Crossroad to provide Paramount investors with annual financial reports.  (SAC ¶ 26; Feldhaus Aff. ¶ 4, Ex. 3 at 8.)

### 2.  Summary of Representations to Individual Plaintiffs

The Second Amended Complaint also describes, in 25 separate subparagraphs, the specific representations certain individual Defendants made to specific Plaintiffs.  (*See* SAC ¶ 27(a)-(y).)  For instance, Plaintiff Steven B. Cummings explains that after his investment was solicited through the May 23, 2007 PPM, Thompson explained to him that "the trading model of the fund [is] conservative and 'foolproof.'"  (*Id.* ¶ 27(a).)   Thompson told Cummings that the

Defendants conducted research to get information about potential investments Paramount should make, and he explained that Paramount had "an incredible track record and historically delivered returns in excess of 20% per year." (*Id.*) Thompson said that any losses would be minimized because Paramount's trader "was constantly watching the market" and Thompson told Cummings that "he personally watched the trading and could track the performance of the fund." (*Id.*)  Based on this information and the other information Paramount used to solicit Cummings's investment, Cummings invested $125,000 in Paramount on or about October 15, 2008.  (*Id.*)  As a result of the Cummings investment, Thompson and CSD received a commission, and Thompson and CSM updated Cummings with written and oral information regarding his investment.  (*Id.*) Then, in December 2008, after purported statements circulated about Paramount's viability, Thompson called Cummings to ensure him that there were no problems with Paramount and Thompson again stated that he was personally watching the fund.  (*Id.*)  According to Cummings, these later representations induced him to keep his investment in Paramount.  (*Id.*)

Other Plaintiffs describe similar discussions they had with Bozora, Redpath, and Thompson, prior to investing in Paramount, and these Plaintiffs recount similar statements made about the past performance of the hedge fund, the safety of the investment, its potential for growth, and the techniques Paramount used to ensure that growth.  (*See, e.g.*, SAC ¶ 27(b) (describing Plaintiff DeHaven's conversations with Bozora); *Id.* ¶ 27(c) (describing Bozora,

Redpath, and Thompson's meetings with Plaintiff Dziedzic).)  These individual accounts explain how Bozora, Redpath, and Thompson assured potential investors that they monitored the hedge fund, had oversight of it, or were otherwise involved in its operations.  (*See* SAC ¶ 27(d) (explaining that Thompson told Plaintiff Gardiner that he was personally tracking the fund); *Id.* ¶ 27(g) (explaining that Thompson told Plaintiff Hegwood that he was monitoring the fund); *Id.* ¶ 27(*l*) (explaining that Bozora and Thompson told Plaintiff R. Thomas Lane that they were overseeing and monitoring Lawton and his trading activities); *Id.* ¶ 27(v) (explaining that Thompson and Bozora told Plaintiff Weekly that were monitoring the fund); *Cf. id.* ¶ 27(c) (explaining that Bozora, Redpath, and Thompson spoke of Paramount using in terms such as "we").)

### 3.    Information Defendants Omitted to Tell Plaintiffs

Plaintiffs also assert that no Defendant informed them of three critically important facts regarding Paramount.  (SAC ¶ 29.)  First, Plaintiffs assert that Defendants failed to inform them of a January 10, 2007 lawsuit filed in this District by Paramount investors who had requested a 100% withdrawal of their investment in the fall of 2005, but did not receive checks from Paramount until June 2006, which were then dishonored by Crossroad's bank.  (*Id.* ¶ 29(a).)  At the time the lawsuit was filed, the investors' withdrawal request was unpaid.  (*Id.*)  However, the investors eventually dismissed that suit when Paramount "came up with sufficient monies to pay the plaintiffs, which monies apparently came from

the proceeds of one or more of the investments in Defendant Paramount by the Plaintiffs herein." (*Id.*)

Next, Plaintiffs state that although the PPMs discussed above specifically represented that Crossroad would provide audited financial statements prepared by the independent accounting firm of Virchow Krause & Co. on an annual basis, "no audited financial statements or reports of Defendant Paramount's operations and portfolio holdings were ever prepared by any certified public accounting firm or provided to any of the Plaintiffs[.]" (*Id.* ¶ 29(b).)  Further, Bozora, Redpath, Thompson, CSM, and CSD continued to offer and sell Paramount's limited-partnership interests even though they knew or should have known that Defendants Lawton, Paramount, and Crossroad were failing to provide audited financial statements and reports to Paramount's limited partners.  (*Id.*)

And third, Plaintiffs point out that the monthly "Performance Histories" that Defendants provided to Plaintiffs omitted any disclaimer that Bozora, Redpath, Thompson, CSM, and CSD had not overseen Paramount's reported performance.  (SAC ¶ 29(c).)  "Given the prior assurance by [these Defendants] that they routinely 'watched trading and could track performance,' the absence of such disclaimer was both a material omission of fact and constituted a continuing representation by [these Defendants] that Paramount 'Performance Histories' were accurate." (*Id.*)

### 4. Positive Income Statements and Monthly Reports

Plaintiffs assert that for the years between 2001 and 2007, Paramount and Crossroad "issued K-1's[4] to the respectve Plaintiffs who had invested in Paramount during or by any such year, with each K-1 purporting to reflect actual positive earnings by Paramount . . . on behalf of the respective Plaintiff[.]"  (SAC ¶ 31.)  Relying on these K-1's, Plaintiffs reported the earnings and corresponding increases in their capital accounts as income on their federal and state income-tax returns.  (*Id.*; *see also id.* ¶ 31, Ex. G.)  For example, Plaintiff Joe Ryan reported over $300,000 of income from increases to his capital account in Paramount during the 2007 year.  (*Id.* ¶ 31, Ex. G.)

Plaintiffs also assert that "Defendants also provided each of the respective Plaintiffs with written monthly statements for each . . . Plaintiff's limited partnership 'account' with Paramount, which . . . generally documented a substantial increase in the dollar amount" of each account.  (*Id.* ¶ 32.)  These reported monthly increases correspond to the increases documented in the "Performance Histories" documentation discussed above.  (*See id.*; *see also id.* ¶ 32, Exs. H1-H2.)

---

[4] "K-1's" as used in the Second Amended Complaint refers to a "Schedule K-1" form from the Internal Revenue Service for reporting a share of income belonging to an individual in a partnership.

**D.    SEC Investigation and Subsequent Events**

In January 2009, the SEC began an investigation of Lawton, Paramount, and Crossroad.  (SAC ¶ 34.)  These Defendants provided the SEC with documentation purportedly showing that Paramount's net assets as of November 30, 2008, were approximately $19,800,000, but had declined to approximately $16,900,000, as of December 31, 2008.  (*Id.*)  Lawton, Paramount, and Crossroad attributed that loss to negative returns on limited partners' investment accounts during December.  (*Id.*)

The SEC determined that Lawton, Paramount, and Crossroad provided false information in connection with the investigation and concluded that on February 13, 2009, Paramount's liquid assets totaled only approximately $1,300,000.  (*Id.* ¶ 35.)  The SEC also concluded that Paramount failed to meet margin calls from Goldman Sachs regarding its stock account on two separate occasions in January 2008, which resulted in Goldman Sachs restricting Paramount's stock trading to merely winding down the account.  (*Id.*)  This was contrary to Lawton, Paramount, and Crossroad's claims that they had an active account with Goldman Sachs.  (*Id.*)

The SEC further determined that limited partners had invested approximately $10,800,000 into Paramount from December 2001 through December 2008, the majority of those investments coming after July 12, 2006, when CSM, CSD, Bozora, Redpath, and Thompson became involved with the hedge fund.  (*Id.* ¶ 36.)  Withdrawals by limited partners during the December

2001-December 2008 period totaled only approximately $1,200,000, leaving a net investment by Paramount's remaining limited partners of around $9,600,000. (*Id.*)  The SEC also concluded that between March 2007 and July 2008, Paramount, Lawton, and Crossroad transferred approximately $2,100,000, from Paramount to Crossroad, and $1,100,000, from Crossroad to Lawton.  (*Id.* ¶ 37.) In January 2009, Lawton withdrew approximately $900,000 from Paramount's stock-trading account at Merrill Lynch, and Thompson apparently disaffiliated himself from Bozora, Redpath, CSM, and CSD.  (*Id.*)  Lawton and Crossroad also notified Plaintiffs in January 2009 that CSM would end its relationship with Paramount and Crossroad, and Lawton would be the "'sole owner of the business.'"  (*Id.*)

Thereafter, the SEC filed a civil-enforcement action against Lawton, Crossroad, and Paramount and obtained a temporary restraining order that froze Lawton, Crossroad, and Paramount's assets.  (*Id.* ¶ 38.)  This terminated these Defendants' trading activities, and the District Court later issued a preliminary injunction.  (*Id.*)

On October 30, 2009, the United States filed a Felony Information against Lawton, charging him with mail fraud for providing fraudulent information to an investor in Minnesota in a monthly account statement and knowingly providing false statements to the SEC.  (*United States v. Lawton*, Crim. No. 09-319 (PAM) ("*USA v. Lawton*"), Doc. No. 1.)  On November 24, 2009, Lawton pleaded guilty to both counts.  (*Id.*, Doc. No. 3.)

### III. Procedural History

Plaintiffs originally filed their Complaint on April 13, 2009.  (Doc. No. 1.)

Before any responsive pleading was filed, Plaintiffs filed an Amended Complaint

on May 14, 2009.  (Doc. No. 4.)  On June 6, 2009, CSM, CSD, Redpath, and

Bozora moved to dismiss the Amended Complaint, and three days later

Thompson moved for dismissal as well.  (Doc. Nos. 6, 9.)  The parties thereafter

stipulated to the filing of a Second Amended Complaint on September 25, 2009

(Doc. No. 24), and Plaintiffs filed their Second Amended Complaint on October 5,

2009.  (Doc. No. 26.)  The moving Defendants then brought the instant motions

to dismiss the Second Amended Complaint.

The Second Amended Complaint asserts 10 counts.  Counts IX and X are

asserted only against Defendants Paramount, Lawton, and Crossroad, who have

not moved for dismissal at this time.  Thus, Counts I-VIII are the only claims

before this Court pursuant to the pending dismissal motions.  Count I claims that

all Defendants were involved in the unlawful sale of unregistered securities under

Section 12(a)(1) of the Securities Act.  Count II asserts that all Defendants made

material misrepresentations and omissions in violation of Section 12(a)(2) of the

Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.  Count III

asserts that all Defendants made material misrepresentations under the

Minnesota Securities Act, and Count IV claims that all Defendants violated the

Minnesota Consumer Fraud Act by fraudulently inducing Plaintiffs to invest in

Paramount.  Count V asserts a common-law claim of unjust enrichment against

all Defendants.  Count VI asserts that CSM, CSD, Bozora, Redpath, and Thompson breached a fiduciary duty to Plaintiffs in these Defendants' capacities as financial planners, and Count VIII claims that these same Defendants breached their fiduciary duties to Plaintiffs as partners in Paramount.  In Count VII, Plaintiffs allege that CSM, CSD, Bozora, Redpath, and Thompson are liable for negligence.  Plaintiffs also include a claim for punitive damages in the Second Amended Complaint's *ad damnum* clause.

CSM, CSD, Bozora, Redpath, and Thompson (collectively the "moving Defendants") now seek to dismiss Counts I-VIII, and the punitive-damages claim asserted in the Second Amended Complaint.  (Doc. Nos. 27, 28.)  Generally, the moving Defendants argue that some of Plaintiffs' claims are barred by the applicable statutes of limitations, that Plaintiffs have failed to state claims for securities fraud under the heightened pleading standards of the Private Securities Litigation Reform Act, and that Plaintiffs' remaining claims should be dismissed for failing to adequately plead facts to support their claims.  (*See generally* Doc. No. 30, Def. Charles T. Thompson Mem. of Law in Supp. of Mot. to Dismiss Second Am. Compl. ("Thompson Mem."); Doc. No. 31, Mem. in Supp. of Defs. Capital Solutions Management, LP, Capital Solutions Distributors, LLC, Timothy R. Redpath, and Michael W. Bozora's Mot. to Dismiss Second Am. Compl. ("Solutions Mem.").)

## DISCUSSION

## I.    STANDARD OF REVIEW

A complaint typically must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), a complaint will be dismissed if it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6). To state a cause of action that will survive a Rule 12(b)(6) motion, a complaint must allege a set of historical facts, which, if proven true, would entitle the plaintiff to some legal redress against the named defendants under some established legal theory.  *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980) (noting that "the complaint must allege facts, which if true, state a claim as a matter of law").  To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 545.  "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' . . .  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

In deciding a motion to dismiss, a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light

most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.

1986).  In doing so, however, a court need not accept as true wholly conclusory

allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th

Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged.

*Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

## II.  Statute-of-Limitations Issues

### A.  Section 12(a)(1) Claims (Count I)

Under Section 12(a)(1) of the Securities Act, any person who:

> offers or sells a security in violation of [section 5] . . . shall be liable
> . . . to the person purchasing such security from him, who may sue
> either at law or in equity in any court of competent jurisdiction, to
> recover the consideration paid for such security with interest
> thereon, less the amount of any income received thereon, upon the
> tender of such security, or for damages if he no longer owns the
> security.

15 U.S.C. § 77*l*(a)(1).  Such claims must be brought "within one year after the

violation" and no more than "three years after the security was bona fide offered

to the public."  15 U.S.C. § 77m.  Courts measure the one-year limitations period

by focusing on the last conduct constituting the alleged violation.  *See*

*Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1064 (D. Minn. 2003)

(citing *Meadows v. Pac. Inland Sec. Corp.*, 36 F. Supp. 2d 1240, 1243 (S.D. Cal.

1999)).

The moving Defendants argue that several of Plaintiffs' claims under

Section 12(a)(1) of the Securities Act are barred by the statute of limitations

because the Defendants' last activity with respect to those Plaintiffs' claims

occurred more than one year ago.  (Thompson Mem. 7-10; Solutions Mem. 9-

11.)  Specifically, the moving Defendants assert that Plaintiffs' Second Amended

Complaint was filed on April 13, 2009, and the following Plaintiffs purchased

limited-partnership interests in Paramount more than one year prior to that date

(as indicated by the corresponding dates listed below), thus barring their claims:

- Ellen DeHaven (purchase on May 1, 2007);
- John Gardiner (purchases on September 18, 2006, March 1, 2007, and November 6, 2007);
- John Gardiner, as Custodian for Max A. Gardiner (purchase on December 28, 2007);
- John Gardiner, as Custodian for Paige M. Gardiner (purchase on December 28, 2007);
- John Gardiner, as Custodian for Jake W. Gardiner (purchase on December 28, 2007);
- Steven R. Gulbrandsen (purchases on September 7, 2003, October 6, 2005, and August 20, 2006);
- Steven R. Gulbrandsen, Profit Sharing Plan (purchase on March 24, 2006);
- Blake Johnson, LLC (purchase on July 27, 2007);
- R. Thomas Lane (purchase on October 19, 2006);
- Craig Mandery (purchase on December 19, 2007);
- Guy M. Peterson (purchase on February 1, 2008);
- Jeffrey M. Petrik (purchase on March 1, 2007);
- Sally Petrik (purchase on March 1, 2007);
- Joseph H. Ryan (purchases on August 22, 2006 and July 31, 2007);
- Sandra M. Ryan (purchases on July 31, 2007, and January 3, 2008);
- Robert Spadafora (purchases on March 1, 2007, September 1, 2007; and January 15, 2008);
- Thomas C. Weekly, IRA (purchases on December 26, 2002; September 8, 2003, July 1, 2005; July 12, 2007, and November 1, 2007)
- Daniel White (purchase on March 1, 2008).

(Thompson Mem., Chart at 8-10; Solutions Mem. 10-11.)

The statute plainly states that "if the action is to enforce a liability created

under [section 12(a)(1)] of this title," it cannot be maintained "unless brought

within one year after the violation opon which it is based." 15 U.S.C. § 77m. And, as noted above, the limitations period is measured from the "last conduct constituting the alleged violation." *Stephenson*, 282 F. Supp. 2d at 1064. Here, the last conduct constituting the alleged violation for the Plaintiffs listed above is each individual's latest purchase of a limited-partnership interest. on the corresponding date. Thus, the alleged violations listed above happened more than one year prior to the filing of the Complaint, and the above-named Plaintiffs' claims fall outside the one-year limitations period.

Plaintiffs acknowledge that they filed this case more than one year after these Plaintiffs purchased their limited-partnership interests in Paramount. (Doc. No. 36, Pls.' Resp. to Defs.' Mots. to Dismiss Second Am. Compl. ("Pls.' Resp.") 18.) But Plaintiffs assert that after Defendants sold them the unregistered securities at issue, Defendants continued to solicit sales from these Plaintiffs. (*Id.*) Plaintiffs argue that because of this continued solicitation the limitations period should not be automatically triggered by the sale of the non-exempt securities at issue here, but, rather, "should be considered suspended post-sale for as long as the violation – i.e., the continuing solicitation of a party who has purchased the nonexempt security – continues." (*Id.* at 18-19.) Plaintiffs assert that this is not an argument for tolling the statute of limitations. Instead, they contend that 15 U.S.C. § 77m is ambiguous with respect to whether continued solicitation can extend the limitations period for violations that occur more than one year before suit is filed. (*See id.* at 19-20.)

It is possible that conduct Plaintiffs characterize as "continued solicitation" could be the type of conduct that would constitute an alleged violation. Courts have indicated that if the last conduct to have occurred that gives rise to the liability under section 12(a)(1) is the "offer" of an unregistered security, *see Stephenson*, 282 F. Supp. 2d at 1064 (listing "offer, sale or delivery" as the three possible triggering dates for the one-year limitations period), the one-year limitations period would begin to run from the offer. However, the Second Amended Complaint contains no factual allegations that the moving Defendants offered unregistered securities to the Plaintiffs listed above after the dates on which they purchased their latest interests. Further, Plaintiffs have provided no support, and this Court can find none, for the proposition that the limitations period continues beyond one year for the completed purchase of an unregistered security when a defendant later offers to sell the same individual a separate unregistered security.

For these reasons, this Court concludes that the above-listed Plaintiffs' Section 12(a)(1) claims should be dismissed because they are barred by the one-year limitations period.

## B. Section 12(a)(2) Claims (Count II)

Under Section 12(a)(2) of the Securities Act, any person who:

offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light

of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l*(a)(2).  Such claims must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m. However, "[i]n no event shall any such action be brought to enforce a liability created under . . . [Section 12(a)(2)] of this title more than three years after the sale."  *Id.*

The moving Defendants argue that certain Plaintiffs' claims under Section 12(a)(2) of the Securities Act are barred by the three-year statute of limitations. (Thompson Mem. 15-16; Solutions Mem. 14-15.)  Specifically, the moving Defendants argue that Plaintiffs' Complaint was filed on April 13, 2009, and the following Plaintiffs last purchased limited-partnership interests in Paramount more than three years prior to that date (as indicated by the corresponding dates listed below), thus barring their claims:

- Stephen R. Gulbrandsen (purchases on September 7, 2003, October 6, 2005, and October 27, 2005)
- Stephen R. Gulbrandsen Profit Sharing Plan (purchase on March 21, 2006)
- Thomas C. Weekly (purchases on December 26, 2002, September 8, 2003, and July 1, 2005)

(Thompson Mem., Chart at 15-16; Solutions Mem. 14-15.)

Plaintiffs acknowledge that § 77m prohibits the filing of actions asserting liability under section 12(a)(2) more than three years after the sale of the security interest. (Pl.'s Mem. 21.) However, Plaintiffs "urge the Court to adopt the 12(a)(1) rationale contained in *Stephenson* for Section 12(a)(2) claims." (*Id.*)

This Court concludes that the above-listed Plaintiffs' claims under Section 12(a)(2) should be dismissed because they are barred by the statute of limitations. The plain language of § 77m provides that an action brought under Section 12(a)(2) can never be brought more than three years after the sale of the security.

This court rejects Plaintiffs' suggestion that this Court should adopt the Section 12(a)(1) rationale in *Stephenson* for Section 12(a)(2) claims. In *Stephenson*, the District Court concluded that the three-year statute of limitations in § 77m does not apply to a Section 12(a)(1) claim for the sale of unregistered securities because such claims must be brought within three years of the date that they were "bona fide offered to the public." *See* 15 U.S.C. § 77m. This three-year period does not apply to Section 12(a)(1) claims for the sale of unregistered securities because "such sales are never, in fact, 'bona fide offered to the public.'" *Stephenson*, 282 F. Supp 2d at 1064. But this rationale has no applicability to that portion of § 77m which governs the absolute three-year limitations period for Section 12(a)(2) claims for misrepresentation and omissions

in the sale of a security which is obviously a different claim than one for the sale of unregistered securities under Section 12(a)(1).  The trigger for the three-year period for Section 12(a)(2) fraud claims is not when the security is bona fide offered to the public; for Section 12(a)(2) claims, § 77m provides, in clearly distinctive language, that the Section 12(a)(2) claims must be brought no "more than three years after the sale."  15 U.S.C. § 77m.  This means that the Section-12(a)(2)-fraud-in-the-sale claim must be brought within three years of the particular sale in which the wrongdoing allegedly occurred.  Thus, the above described Section 12(a)(2) claims of Plaintiffs Gulbrandsen and Weekly should be dismissed because they are barred by the three-year statute-of-limitations period.

### C.     Section 10(b) and Rule 10b-5 Claims

Bozora, Redpath, CSM, and CSD argue that Plaintiff Steven Gulbrandsen's Section 10(b) and Rule 10b-5 claim based on his September 7, 2003 purchase, and Plaintiff Thomas Weekly's Section 10(b) and Rule 10b-5 claim based on his December 26, 2002 purchase are barred because they are outside the five-year limitations period for private securities-fraud actions. (Solutions Mem. 26.)

Private securities-fraud cases brought more than five years after the date of the alleged violation are time-barred because "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not

later than the earlier of . . . 2 years after the discovery fo the facts constituting the violation [or] 5 years after such violation." 28 U.S.C. § 1658(b). Plaintiffs concede that Gulbrandsen and Weekly's claims are outside the five-year period, but they argue that their claims should be permitted to go forward because they "have alleged continuing acts of misrepresentation that caused them to make additional investments and remain invested in Paramount." (Pls.' Resp. 22.) It appears that Plaintiffs are asserting that the statute of limitations on Gulbrandsen's 2003 claim and Weekly's 2002 claim should be tolled under the so-called "continuing-violation doctrine" or under a theory of fraudulent concealment.

Some courts have determined that a continuing fraud or fraudulent concealment can toll the statute of limitations for Section 10(b) and Rule 10b-5 claims when it is pleaded with sufficient particularity. *See, e.g.*, *Bilick v. Eagle Elec. Mfg. Co.*, 807 F. Supp. 243, 253 (E.D.N.Y. 1992) (stating that a federal securities claim may be equitably tolled because of fraudulent concealment when plaintiffs show that the defendant "took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing") (quotations omitted). Other courts, addressing the question prior to Congress's adoption of 28 U.S.C. § 1658, have questioned whether the fraudulent-concealment doctrine applies to federal securities claims. *See, e.g.*, *Cohen v. McAllister*, 688 F. Supp. 1040, 1045 (W.D.Pa. 1988) (stating that Third Circuit precedent set an absolute three-year limitation on private securities

actions, but noting at footnote 3 that "[t]he view that the fraudulent concealment doctrine does not apply in this case flies in the face of Justice Frankfurter's statement that this equitable doctrine is read into every federal statute of limitations") (quotations and alterations omitted).  One commentator has stated that "[t]he better view would seem to be that since fraudulent concealment and the concept of a continuing fraud are readily accepted under common law, they should be equally applicable to Rule 10b-5 claims regardless of the expiration of the five-year period."  4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.16[7] & n.134 (6th ed. 2005).  And this District has observed that "[u]nder the federal law of equitable tolling, the statute of limitations for a 10b-5 action does not begin to run until such time that the alleged securities fraud is or should have been discovered.  *Beaubaire v. Priorwood Townhomes Ltd. P'Ship I*, Civ. No. 4-90-43 (DSD/FEB), 1992 WL 320991, at *3 (D. Minn. 1992) (citing *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8th Cir. 1970)).  This means that plaintiffs seeking to invoke the doctrine of fraudulent concealment must show that the defendant "took active steps, independent of the original fraud, to cover up the alleged securities violations."  *See id.* at *4 (citing *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987), for the proposition that "fraudulent concealment may be invoked only if a plaintiff establishes affirmative conduct by defendants that would lead a reasonable person to believe that he had no claim for relief").

To support Gulbrandsen's assertion of fraudulent concealment, Plaintiffs point to paragraph 27(f) of the Second Amended Complaint, which states, in part, that Gulbrandsen had "multiple phone conversations with Lawton from August 2003 through 2008 during which Lawton touted the stellar performance of the fund."  (SAC ¶ 27(f).)  That paragraph continues, stating that "Plaintiff was not aware of the fraud, nor could have he, with reasonable diligence, discovered the fraud until the SEC investigation."  (*Id.*)  To support Weekly's assertion of fraudulent concealment, Plaintiffs point to paragraph 27(v) of the Second Amended Complaint, which states, in part, that Weekly had conversations with Lawton in 2008, following news of the "'Madoff' investment scam," in which Lawton "assured [Weekly] that the fund had been audited and checked for legal compliance by professionals."  Plaintiffs further allege that Weekly kept his investment in the fund as a result of this and assert that Weekly could not have discovered, even exercising reasonable diligence, "the fraud that was taking place within and related to Defendant Paramount until the SEC ultimately discovered the fraud."  (SAC ¶ 27(v).)  In this Court's view, these statements are conclusory and, therefore, insufficient to satisfy the standards for pleading fraudulent concealment.  *See Bilick*, 807 F. Supp. at 253 (explaining that fraudulent concealment must be pleaded with particularity).  Accordingly, this Court recommends that Gulbrandsen and Weekly's Section 10(b) and Rule 10b-5 claims be dismissed as time barred.

## III. Securities Fraud: Section 10(b) and Rule 10b-5 (Count II)

In Count II of the Second Amended Complaint, Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the rules promulgated by the SEC. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Plaintiffs assert that the moving Defendants are liable because each was a primary violator of section 10(b) and Rule 10b-5 and they are all "controlling persons" under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Section 10(b) of the Exchange Act prohibits the use of "any manipulative or deceptive device or contrivance" in violation of the SEC's rules and regulations "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it unlawful "for any person . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to a make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009).

"The [Private Securities Litigation Reform Act ("PSLRA")] imposes heightened pleading requirements on private actions 'to curb perceived abuses'

of such actions, including 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007)). One such heightened pleading requirement is that the complaint must state any allegedly misrepresentation of omission of marterial fact with specificity and explain why the statement is misleading.  15 U.S.C. § 78u-4(b).  In other words, "a securities plaintiff often must plead the 'who, what, when, where and how' of the misleading statements or omissions."  *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008) (hereinafter "*Crowell Trust*") (quoting *In re K-tel Int'l Sec. Litig.*, 300 F.3d 881, 890 (8th Cir. 2002)).  The other heightened pleading requirement for securities-fraud actions is that the plaintiff "must also state with particularity facts giving rise to a strong inference that the defendant acted with the scienter required for the cause of action."  *Mcadams*, 584 F.3d at 1113 (quotations omitted).  "Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity."  *Crowell Trust*, 519 F.3d at 782.

## A.    Primary liability

Any analysis of the securities-fraud issues in this case must start with the fact that Defendant John Lawton has already pleaded guilty to devising a scheme

to defraud investors in Paramount hedge fund, through the fund's general partner Crossroad.  The United States Attorney charged Lawton with making material misrepresentations to prospective investors through fact sheets touting the success of the hedge fund, falsifying the fund's performance history, and providing investors with false monthly statements regarding the increase of their investments' value, and the Government asserted that these false statements caused new investors to invest and existing investors to invest additional funds. *See USA v. Lawton*, Crim. No. 09-319 (PAM), Doc. No. 1.  Lawton pleaded guilty on November 24, 2009, and is awaiting sentencing.  Therefore, this is not a garden variety securities-fraud case where shareholders are trying to link alleged misstatements or omissions about a company's performance to stock-market losses.  Here, we start with the fact that the crime of securities fraud was committed by a principal actor in a successful scheme to cheat investors.   The question now is how far the wrongdoing and liability extends amongst the moving Defendants.

### 1. Defendant Thompson[5]

***Misrepresentations***

This Court first addresses the alleged misrepresentations or omissions

made by Thompson.  Thompson asserts that the Second Amended Complaint

---

[5] The moving Defendants argue that Lawton, Crossroad, and Paramount are responsible for all the misrepresentations made in Paramount's Private Placement Memoranda, Performance Histories, and Positive K-1 statements, and they assert that Plaintiffs have failed to link the moving Defendants to those documents' production.  Plaintiffs, on the other hand, argue that the group-publication doctrine applies to their claims based on three documents.  "Under the group publication doctrine, SEC filings and press releases are presumed to be 'the collective work of those individuals with direct involvement in the everyday business of the company.'"  *In re Retek Inc. Sec. Litig.*, Civ. No. 02-4209 (JRT/SRN), 2007 WL 14352, at *6 (D. Minn. Jan. 3, 2007) (quoting *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 983 (D. Minn. 2004) (Kyle, J.).  Under this doctrine, "'the complaint[] need not draw a specific connection between these defendants and every alleged omission and misrepresentation.'"  *Id.* (quoting *In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1101 (D. Minn. 1998) (Tunheim, J.).  However, there is some question whether the group-publication doctrine (also known as the "group-pleading doctrine") has survived the passage of the PSLRA.  *See Tellabs*, 551 U.S. at 325 n.6 (noting that the Seventh Circuit had concluded that allegations of scienter cannot be imputed against one defendant to other individual defendants, but not ruling on the issue because it was not presented).  There is even some question among the Courts of this District.  *Compare Retek*, 2007 WL 14532, at *6-7 (applying the group-publication doctrine in denying a motion to dismiss), *and In re Stellent*, 326 F. Supp. 2d at 983 (same), *with In re Hutchinson Tech. Inc. Sec. Litig.*, 502 F. Supp. 2d 884, 901 (D. Minn. 2007) (Schiltz, J.) (agreeing with those courts that have held that group-pleading doctrine is inconsistent with the Reform Act's particularity requirements), *and In re Patterson Cos., Inc. Sec. & Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1028-29 (D. Minn.  2007) (Doty, J.) (same).  This Court need not decide this issue in this case however, because this Court concludes, as more fully set forth in the following sections of this Report and Recommendation, that Plaintiffs have otherwise adequately pleaded securities-fraud violations under a primary-liability theory against each of the moving Defendants.

contains only "generic representations about the management and risk level of the fund allegedly made by Thompson, such as the fund was 'safe', 'well-managed', and 'lower risk than most hedge funds,'" and that Plaintiffs have failed to plead facts that demonstrate how or why any statements he made were false. (Thompson Mem. 21.)

Several Plaintiffs assert that Thompson met with them on one or more occasions, and in these meetings he told them that he was personally monitoring Paramount's trading and could track performance of the fund, or that Bozora and Redpath were monitoring the fund, and that this monitoring should allay any doubts the investors may have because of Lawton's trading methods.  (*See, e.g.*, SAC ¶¶ 27(a), (d), (e), (g), (l), (p), (s), (t), (v).)  Plaintiff Cummings explains that he had conversations with Thompson in which Thompson made such statements during the period leading up to October 2008 while Thompson was soliciting Cummings's investment in Paramount.  (*Id.* ¶ 27(a).)  And other Plaintiffs who allege that Thompson solicited their limited-partnership investments provide a timeframe for when Thompson's statements were made.  (*See, e.g.*, *id.* ¶¶ 27(d) (stating that Thompson contacted Gardiner in May 2006 and that Thompson said he was monitoring the fund); 27(e) (describing statements made by Thompson in July 2008).)   Thompson allegedly made these statements for the purpose of making Paramount and Crossroad appear to be a "sophisticated, secure and reliable investment vehicle for Plaintiffs to invest in as limited partners" and to induce potential investors to purchase limited-partnership interests in the fund.

(*Id.* at ¶ 28.)  According to the Second Amended Complaint, these statements were false because Thompson was not actually monitoring or overseeing any trading activity.  (*Id.* ¶ 51.)

Plaintiffs also allege that Thompson misrepresented to both existing and potential investors the performance history of the Paramount hedge fund by sending them emails, which contained information about how the fund was managed and what its specific annual rates of growth were from 2002-2007. (SAC ¶ 19.)  Thompson allegedly sent one such email to potential investors on July 1, 2008.  (*Id.*, Ex. E.)  Thompson's alleged purpose in making these statements was to induce certain Plaintiffs to invest in Paramount by purchasing limited-partnership interests.  (*Id.*)  According to the Second Amended Complaint these statements were false because the actual figures showing Paramount's annual growth rates did not produce a cumulative total of 167.71% from 2002 through 2007, which is what Thompson represented.  (*Id.* at ¶ 53(a).)

Thompson also allegedly represented to several Plaintiffs that an accounting firm, Virchow, Krause & Co., performed an annual audit of the hedge fund's performance.  (*See* SAC ¶¶ 27(g).)  According to Plaintiffs, these statements were false because Plaintiffs were never provided with accountant-audited financial statements for the performance of the fund and the fund's cash assets and trading accounts were not, in fact, being followed or audited by the accounting firm Virchow, Krause & Co., or any other accounting firm.  (*See id.* at ¶¶ 53(i)-(j).)

This Court concludes that Plaintiffs have sufficiently alleged that Thompson made material misrepresentations to several Plaintiffs, which "taken together and in context, would have misled a reasonable investor." *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 881 (D. Minn. 2007) (indicating that the central issue is whether the defendant's representations would have misled a reasonable investor) (quotation omitted). Thompson's statements to various investors regarding monitoring the fund, the fund's prior performance, and its oversight by a disinterested third-party accounting firm would leave a reasonable investor believing that the investments were safer than they would have been had he or she been told that the trading was not monitored, the prior performance of the fund was not as represented, and that the fund was not overseen by an independent accounting firm.

### *Scienter*

Thompson contends that any Section 10(b) and Rule 10b-5 claims against him should be dismissed because the Second Amended Complaint fails to allege sufficient facts to raise a strong inference of scienter. (Thompson Mem. 17-20.) Thompson also asserts that in the event any inference can be drawn that he acted with the requisite state of mind to be liable on a securities-fraud claim, such an inference is "fatally weakened given the fact Thompson was an investor in Paramount, was swindled by Lawton, and is at risk to lose approximately $510,000 in investments with Paramount." (*Id.* at 20.)

In response, Plaintiffs assert that the following facts asserted in the Second Amended Complaint support a strong inference of Thompson's scienter. First, Thompson either must have known, or was in a position that he recklessly disregarded information that Paramount was in serious trouble even as he participated in the publication of statements showing a fraudulent value of the fund. (Pl.'s Resp. 33.) Second, Thompson either knew or recklessly disregarded that the fund was not performing well because the "crux of the fraud" alleged here relates to misrepresentations about how well the fund was performing and how much money was in the fund. (*Id.* at 33-34.) Third, Thompson's representations about the fund's performance were not supported by any data, which could not have been obtained because no data on stocks purchased or held was ever gathered. (*Id.* at 34.) Fourth, Thompson's dissociation with Lawton within a month of the SEC investigation also supports an inference of scienter. (*Id.* at 34-35.) And, finally, Thompson's position with, and ownership interest in, business entities related to Paramount suggest that he had access to information about the fund's performance and he either had to have known or recklessly disregarded this information when he made the representations about the fund's performance. (*Id.* at 35.)

This Court concludes that Plaintiffs allege sufficient facts to raise a strong inference of Thompson's scienter. According to the Second Amended Complaint, Thompson managed CSM and CSD. Through that management, he entered a relationship with Paramount whereby CSM acquired minority

ownership of Paramount and CSD became Paramount's exclusive distributor. And the May 23, 2007 Private Placement Memorandum provides that CSM would advise and assist Lawton and Crossroad "in business planning, business management, business development, and fundraising." (SAC ¶ 16.) This relationship permits an inference that Thompson had access to information that contradicted the statements he was making in soliciting future investors. *See In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 746 (8th Cir. 2002) ("One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting these public statements to be materially inaccurate.").

Thompson's argument that any inference of scienter is "fatally weakened" by the fact that his own money was invested in Paramount presents a relevant counter-inference that is appropriate for this Court to consider. *See Tellabs*, 551 U.S. at 323 (establishing that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences"). Thompson asks this Court to infer that he could not have known about the fund's poor performance or recklessly disregarded it because he stood to lose his own money. But Thompson's argument loses much of its competing force when, pursuant to the Limited Partnership Agreement and the Private Placement Memoranda, his company, CSM, stood to gain an additional 10% ownership interest in the fund for each $2,000,000 in new assets it brought under Crossroad's management, and it is not implausible that Thompson used

his own investment in the fund as a sales tool to snare investors in the scheme. (*See* SAC ¶ 27(e) ("Thompson showed Plaintiff [Gartner] his own investment of $500,000 in Paramount stating that he [Thompson] wished he could get his money out of the real estate investments with Cavan to invest in Paramount[.]").)

Thus, this Court concludes that the Second Amended Complaint presents facts that give rise to an inference of Thompson's scienter that is "strong in light of other explanations," *see Tellabs*, 551 U.S. at 324, and Thompson's motion to dismiss should be denied on this basis.

### Loss Causation

Thompson next contends that Plaintiffs' Second Amended Complaint should be dismissed because Plaintiffs have failed to sufficiently plead loss causation as required to state a claim under Section 10(b) and Rule 10b-5. A plaintiff satisfies the loss causation requirement of Section 10(b) and Rule 10b-5 by alleging facts that support "'a causal connection between the material misrepresentations and the loss.'" *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). In other words, "the defendant's fraud—and not other events— [must have] caused the security's drop in price." *Id.* (citations omitted). A court assesses loss causation under "ordinary pleading rules." *Dura*, 544 U.S. at 347. Thus, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* As the Eighth Circuit

explained, this means that "the plaintiff must show 'that the loss was foreseeable *and* that the loss [was] caused by the materialization of the concealed risk.'" *Schaaf*, 517 F.3d at 550 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3dd 161, 173 (8th Cir. 1986)) (emphasis in original).

This Court concludes that Plaintiffs have adequately pleaded loss causation. According to the Second Amended Complaint, Thompson misrepresented that the hedge fund employed a proprietary trading strategy when, in fact, it did not; that the fund was independently overseen by an accounting firm and a law firm when no such oversight actually occurred; and that the fund had a successful track record reflecting substantial and consistent gains when, in fact, no such track record of successful investment existed. These statements concealed the risk that Plaintiffs were investing in a hedge fund that did not engage in independently monitored trading pursuant to a proprietary strategy that had proven its success over time. And the loss Plaintiffs have alleged they suffered—that their entire limited-partnership investments in the hedge fund are no longer of any value—was the foreseeable result of such concealment because Thompson allegedly knew or was severely reckless in his disregard of the fact that Paramount was not the successful hedge fund he represented it to be. Thus, this is not a case where the lesser value of Plaintiffs' investments "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or

together account for some or all of that lower price."  *See Schaarf*, 517 U.S. at 550 (quoting *Dura*, 544 U.S. at 343).  Rather, the lesser value of Plaintiffs' investments are allegedly the direct result of the fact that Paramount was not at all what Thompson represented it to be.

Thompson contends that the Second Amended Complaint demonstrates that it was Lawton, Crossroad, and Paramount's misappropriation of the limited partnership funds that caused the losses Plaintiffs suffered.  (Thompson Mem. 23.)  Essentially, Thompson asserts that any misrepresentations the Second Amended Complaint alleges he made could not have been the legal cause of Plaintiffs' losses because the misappropriation of Paramount funds by other actors was an intervening cause for those losses.  *See* Black's Law Dictionary 250 (9th ed. 2004) (defining "intervening cause" as "[a]n event that comes between the initial event and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury").  But, as alleged in the Second Amended Complaint, Thompson's misrepresentations concealed the fact that Plaintiffs were, in essence, making a worthless investment into a hedge fund that did nothing Thompson stated it would do.  In that regard, Plaintiffs have given Thompson "some indication of the loss and the causal connection that the plaintiff has in mind," *see Dura*, 544 U.S. 347, and the Second Amended Complaint presents the reasonable expectation that discovery will reveal evidence of the proximate cause alleged.  *See Twombly*, 550 U.S. at 545.  Accordingly, Thompson's motion to dismiss should be denied on this basis.

### 2. Bozora and Redpath

***Misrepresentations***

Several Plaintiffs allege that they spoke with Bozora regarding Paramount. For instance, Plaintiff DeHaven explains that she interacted with Bozora "for several months prior to April 2007," and during those interactions Bozora explained that Paramount had a "great track record." (SAC ¶ 27(b).) Bozora explained that he had oversight of the fund and that the fund's assets were "with Goldman Sachs." (*Id.*) Bozora gave DeHaven a copy of the May 2007 Private Placement Memorandum and several Performance Histories and told Dehaven that no more than 25% of her investment could be lost because of measures that the fund had in place to limit losses. (*Id.*) Similarly, Plaintiff Dziedzic explains that he initially met with Bozora (along with Thompson and Redpath) in the winter of 2008-2009 in Minneapolis. (*Id.* ¶ 27(c).) Either Bozora or Redpath told Dziedzic that all the "regulatory checks were in place" and explained that the fund had an auditor, accountant, and lawyer when Dziedzic asked about oversight of the fund. (*Id.*) Dziedzic also alleges that Bozora and Redpath described Paramount as a hedge fund that "day traded and went to cash every night." (*Id.*) Plaintiffs Thomas Lane and Joseph Ryan also state that they met with Bozora and that Bozora solicited their investments in Paramount. (SAC ¶¶ 27(l), (t).) Bozora (along with Thompson) told Thomas Lane that he oversaw and monitored the fund's trading activities to ensure proper handling of investors' money. (*Id.* ¶ 27(l).) Bozora showed Joseph Ryan information representing Paramount's

historical performance, told Joseph Ryan that he was overseeing the fund's investments, and explained that the fund was engaged in day trading, but would end every day in a cash position. (*Id.* ¶ 27(t).)

Plaintiffs Dziedzic and Peterson also explain that they met with Redpath and discussed investing in Paramount with him. (SAC ¶¶ 27(c), (q).) As described above, Dziedzic met with Redpath (along with Thompson and Bozora) in the winter of 2008-2009, and Redpath described the day-trading method of Paramount and that it ended each day in a cash position, and either Redpath or Bozora explained to him that they monitored the fund. (*Id.* ¶ 27(c).) Peterson asserts that he met with Bozora and Redpath in Eden Prairie, Minnesota, in January 2008. (*Id.* ¶ 27(q).) Bozora and Redpath recommended that Peterson invest in Paramount, explained that Paramount was a hedge fund with a day-trading model that ended in a cash position every night, and provided Peterson with documents showing that the fund's historical performance was very good. (*Id.*)

According to the Second Amended Complaint, all the foregoing statements were false because the fund's historical performance was not as successful as Bozora and Redpath allegedly represented it to be to these Plaintiffs, Bozora and Redpath were not overseeing or monitoring the fund, and the fund did not engage in any day trading or close at a cash position every night. (*See* SAC ¶ 51.)

This Court concludes that Plaintiffs have set forth sufficient allegations that Bozora and Redpath made material misrepresentations to several Plaintiffs, which "taken together and in context, would have misled a reasonable investor." *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d at 881. Their statements to various investors regarding their monitoring of the fund, the fund's prior performance, and its trading activities would leave a reasonable investor believing that the investments were safer than they would have been had he or she been told that the trading was not monitored, the prior performance of the fund was not as represented, and that the fund was not actually engaged in the day-trading model represented. Plaintiffs have therefore identified several material misrepresentations made by Bozora and Redpath such that their motion to dismiss should be denied on this basis.[6]

### *Scienter*

Bozora and Redpath also argue that Plaintiffs have failed to plead facts giving rise to a strong inference of scienter because the Second Amended

---

[6] Bozora and Redpath may be arguing that some Plaintiffs' Section 10(b) and Rule 10b-5 claims against them should be dismissed because they never met with certain Plaintiffs. However, this Court views the Second Amended Complaint as joining the claims of some Plaintiffs against certain Defendants with claims of other Plaintiffs against other Defendants. This is, of course, proper under the liberal joinder rules of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 20(a)(1) ("Persons may join in one action as plaintiffs if: . . . they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and . . . any question of law or fact common to all plaintiffs will arise in the action.").

Complaint contains only "rote allegations" of their intent to deceive.  (*See* Solutions Mem. 23-24.)  This Court concludes, however, that Plaintiffs allege sufficient facts to raise a strong inference of Bozora and Redpath's scienter. According to the Second Amended Complaint, Bozora and Redpath were co-founders of CSM and CSD.  CSM acquired minority ownership of Paramount and CSD became Paramount's exclusive distributor.  The May 23, 2007 Private Placement Memorandum provides that CSM would advise and assist Lawton and Crossroad "in business planning, business management, business development, and fundraising."  (SAC ¶ 16.)  The Second Amended Complaint describes a connection between CSM, CSD, Paramount, and Crossroad, and Bozora and Redpath's direct ownership and control of CSM and CSD renders it implausible that they had no access to information about Paramount's historical performance or the lack of day-trading activity taking place, or that they were not monitoring the fund as represented.  As with Thompson's management of CSM and CSD, the relationship between CSM, CSD, Paramount, and Crossroad permits an inference that Bozora and Redpath had access to information that contradicted the statements they made in soliciting future investors.  *See In re Navarre*, 299 F.3d at 746.  Therefore, this Court concludes that Bozora and Redpath's motion to dismiss should be denied to the extent it seeks dismissal of the Second Amended Complaint on this basis.

***Loss Causation***

Bozora and Redpath raise the same arguments regarding loss causation as those raised by Thompson, which are discussed above. Specifically, Bozora and Redpath argue that the Second Amended Complaint only attribute the proximate cause of Plaintiffs' economic losses to the misappropriation of funds by Lawton, Crossroad, and Paramount, and not to Bozora and Redpath's conduct. (Solutions Mem. 24-25.) For the same reasons this Court concluded that the Second Amended Complaint sufficiently plead loss causation with respect to Thompson's misrepresentations, *see* discussion, *supra*, p. 40-43, this Court concludes that Plaintiffs' have adequately pleaded loss causation with respect to Bozora and Redpath.

### 3. CSM and CSD

This Court concludes that because the Second Amended Complaint has adequately stated Section 10(b) and Rule 10b-5 claims against Thompson, Bozora, and Redpath, it has also stated such claims against CSM and CSD. Just as a corporation "'can only act through its employees and agents,'" *Vohs v. Miller*, 323 F. Supp. 2d 965, 972 (D. Minn. 2004) (quoting *Suez Equity Inestors v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)), a limited partnership is an inanimate entity that can act only through its agents. *See Lugosch v. Congel*, No. Civ. 1:00-CV-0784, 2006 WL 931687, at *19 (N.D.N.Y. Mar. 7, 2006) ("A partnership is much like a corporation inasmuch as it is an inanimate entity that can act only through its agents.")). For this reason, the scienter of Thompson,

Bozora, and Redpath, as officers and agents of CSM and CSD, can be imputed to CSM and CSD. *See In re St. Paul Travelers Sec. Litig. II*, Civil No. 04-4697 (JRT/FLN), 2006 WL 2735221, at *4 n.3 (D. Minn. Sep. 25, 3006) ("The scienter of senior executives can be imputed to the corporate defendants"); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 367 (5th Cir. 2004) (holding that at least one corporate agent must possess the requisite scienter in order for a court to impute scienter to the corporation); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006) (stating that when facts alleged give rise to a strong inference of scienter with respect to a corporate agent, the court imputes that scienter to the corporate principal), *vacated and remanded on other grounds by Tellabs*, 551 U.S. 308 (2007); *see also In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 494 (S.D.N.Y. 2001) (quoting *Vento & Co. of New York, LLC v. MetroMedia Fiber Network, Inc.*, No. 97 Civ. 7751, 1999 WL 147732, at *12 (S.D.N.Y. Mar. 18, 1999), for the proposition that "if *Central Bank* [*of Denver, N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164 (1994)] had precluded liability of a principal for the misconduct of its agent, that decision would have prevented any liability by corporations or partnerships under Rule 10b-5 since such legal entities *can only act through their natural agents*. There is no indication that the Supreme Court intended such a drastic restriction on the possible defendants in securities fraud lawsuits.")). Thus, this Court concludes that the Second Amended Complaint sufficiently states primary-liability claims under Section 10(b) and Rule 10b-5 against CSM and CSD.

## B. Control-person Liability

Plaintiffs have also asserted that the moving Defendants are liable as "controlling persons" of Paramount under Section 20(a) of the 1934 Act. *See* 15 U.S.C. § 78t(b). The moving Defendants argue that Plaintiffs merely set forth conclusory allegations with respect to control-person liability, and therefore Plaintiffs' claims should be dismissed. (*See* Thompson Mem. 11-13 (addressing argument to Plaintiffs' Section 12(a)(1) claims); Thompson Reply 5-6 (not specifying which control-person claims were being challenged); Solutions Mem. 20-23.)

Under Section 20(a) of the 1934 Act, "[e]very person who, directly or indirectly, controls any person liable" under Section 10(b) and Rule 10b-5 "shall also be liable jointly and severally with and to the same extent as such controlled person is liable." 15 U.S.C. § 78t. To state a claim under Section 20(a) of the Exchange Act, a plaintiff must plead "(1) an alleged control person actually exercised control over the general operations of the primary violator; and (2) the alleged control person possessed but did not necessarily exercise the power to determine the specific acts or omissions upon which the underlying violation is predicated." *In re Retek*, 621 F. Supp. 2d at 709. Control-person claims are predicated on plaintiffs first establishing that a controlled person was a primary violator. *Id.*; *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1038-39 (D. Minn. 2009). Whether an individual is a controlling person is "an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day

affairs of the corporation and the defendant's power to control corporate actions."

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 286 F. Supp. 2d 1047, 1060 (D. Minn. 2003) (quotations omitted). Section 20(a) "is not subject to the heightened pleading standards of either the Reform Act or Fed. R. Civ. P. 9(b)." *Stephenson*, 282 F. Supp. 2d at 1059.

Here, the moving Defendants do not dispute that Plaintiffs have alleged sufficient facts to state a claim that Lawton, and through him, Paramount and Crossroad, are primary violators; rather, they argue that Plaintiffs have failed to plead facts that show that the moving Defendants ever exercised control over the operations of Paramount or Crossroad or over Lawton's investment activities. This Court disagrees. Plaintiffs have asserted that Thompson, Bozora, and Redpath were the managers and co-founders of CSM and CSD. Plaintiffs have also alleged that CSM and CSD executed agreements with Lawton, Paramount, and Crossroad through which CSM and CSD became a part owner of Paramount and the hedge fund's *exclusive* distributor respectively. The Second Amended Complaint also describes how, after the moving Defendants became involved with Paramount, the number and amount of investments in the hedge fund dramatically increased. It is reasonable to infer from these allegations that the moving Defendants did, in fact, exercise sufficient control over Paramount and Crossroad's day-to-day operations to influence the specific acts forming the basis for Lawton, Paramount, and Crossroad's primary violations. The moving Defendants' relationship with Lawton, Paramount, and Crossroad put these

Defendants in a position to alter the way that the hedge fund was being solicited to investors.  That is the very nature of being part owner of the hedge fund and its exclusive distributor.

Thompson also argues that he cannot be a controlling person of Paramount because Delaware law prohibits him, as a limited partner, from exercising any control over the partnership's affairs, and because the Limited Partnership Agreement provides that no limited partner will have any control or management of Paramount's affairs.  (Thompson Mem. 11-12.)  However, Thompson's argument ignores the fact that he managed CSM, which is an entity that began as a 10% owner in Crossroad and increased its ownership substantially through the growth of the hedge fund pursuant to the fund's terms. Whatever the limitations placed on his conduct by provisions of Delaware law that forbid limited partners from exercising control over a limited partnership, the facts alleged by Plaintiffs permit an inference that Thompson did exercise day-to-day control over Paramount through his position with CSM.

For these reasons, this Court concludes that the Second Amended Complaint adequately states a claim for controlling-person liability under Section 20(a).

## IV.    Remaining Section 12(a)(1) Claims (Count I) and Remaining Section 12(a)(2) Claims (Count II)

The moving Defendants assert that Plaintiffs' Section 12(a)(1) and Section 12(a)(2) claims of the Securities Act (i.e., those that are not barred by the statute

of limitations as discussed above), should be dismissed because Plaintiffs have failed to allege that the moving Defendants are statutory sellers of the securities. (Solutions Mem. 11-14; Thompson Mem. 13-14.)

Section 12(a)(1) provides that any person who offers or sells a security in violation of 15 U.S.C. § 77e, which relates to the sale of unregistered securities, shall be liable to the person who purchases the security from him or her. 15 U.S.C. § 77*l*(a)(1). Section 12(a)(2) similarly provides that any person who offers or sells a security using the mails or by means of a prospectus that includes misrepresentations or material omissions shall be liable to the person who purchases the security from him or her. 15 U.S.C. § *77l*(a)(2). Under *Pinter v. Dahl*, 486 U.S. 622 (1988), Section 12 imposes liability on the buyer's immediate seller and the person who "solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647. This "'[s]eller's liability under § 12 is properly imposed . . . against the person who passes title to the security and also to securities issuers and brokers who successfully solicit a purchase." *In re Prof'l Fin. Mgmt., Ltd.*, 692 F. Supp. 1057, 1064 (D. Minn. 1988) (citing *Pinter*, 486 U.S. at 642).

The moving Defendants all argue that some Plaintiffs do not allege that certain of the moving Defendants were involved in the sale of their limited-partnership interests at all. Although some Plaintiffs only allege that they met with certain Defendants who personally solicited the sale of a limited-partnership interest in Paramount, the moving Defendants do not dispute that Paramount,

Crossroad, and Lawton were primary violators of Sections 12(a)(1) and 12(a)(2). Every person who, through stock ownership, agency, or otherwise, controls any person liable under Section 12 is also jointly and severally liable for such violations. *See* 15 U.S.C. § 77*o*. "In order to state a claim for liability under [15 U.S.C. § 77*o*], a plaintiff must allege 'a primary violation by a controlled person, and (b) control by the defendant of the primary violator.'" *Anegada Master Fund, Ltd. v. PXRE Group Ltd.*, __ F. Supp. 2d __, 2010 WL 299478, at *7 (S.D.N.Y. Jan. 26, 2010) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007)).

For the reasons discussed above in connection with Plaintiffs' controlling-person claims for violations of Section 10(b) and Rule 10b-5, *see* discussion, *supra*, p. 49-53, Plaintiffs have sufficiently alleged that the moving Defendants are controlling persons within the meaning of 15 U.S.C. § 77*o*. Plaintiffs have adequately pleaded facts making it plausible that these Defendants were involved in the day-to-day operations of Paramount and Crossroad. And, according to the Second Amended Complaint, the relationship between these entities and the violating individuals was so entangled that it is reasonable to infer that these Defendants exercised such control over the solicitation of Paramount's limited-partnership interests that the solicitation efforts were "directly attributable to the [moving Defendants]." *See Stephenson*, 282 F. Supp. 2d at 1063 (quotations omitted). Therefore, this Court concludes that Plaintiffs' Section 12(a)(1) and Section 12(a)(2) claims should not be dismissed.

## V. Minnesota Securities Act Claims (Count III)

The parties all agree that Plaintiffs' claims under the Minnesota Securities Act in Count III of the Second Amended Complaint are subject to essentially the same analysis as Plaintiffs' Section 10(b) and Rule 10b-5 claims in Count II. (*See* Pl.'s Resp. 39-40; Solutions Mem. 27-28; Thompson Mem. 25-26.) For the reasons discussed above, *see* discussion, *supra*, Section II, this Court concludes that moving Defendants' motions to dismiss Count III of the Second Amended Complaint should be denied.

## VI. Minnesota Consumer Fraud Act Claims (Count IV)

In Count IV of the Second Amended Complaint, Plaintiffs assert a claim under the Minnesota Consumer Fraud Act ("MCFA"), *see* Minn. Stat. § 325F.69, which includes a claim for damages, costs, and attorney fees under the Private Remedies section of the Attorney General Statute ("Private AG Statute"), *see* Minn. Stat. § 8.31. In relevant part, the MCFA provides:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

Minn. Stat. § 325F.69, subd. 1. "Merchandise," within the meaning of the MCFA, means "objects, wares, goods, commodities, intangibles, real estate, loans, or

services."[7]  Minn. Stat. § 325F.68, subd. 2.  The MCFA "is remedial and should be liberally construed in favor of protecting consumers."  *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000).  Under the Private AG Statute, "'any person injured by a violation' of the laws entrusted to the attorney general to investigate and enforce may recover damages together with costs and attorneys fees" by bringing a private civil action.  *Id.* at 310 (quoting Minn. Stat. § 8.31, subd. 3a). "[T]he Private AG statute applies only to those claimants who demonstrate that their cause of action benefits the public."  *Id.* at 314.  "To determine whether a lawsuit is brought for the public benefit the Court must examine not only the form of the alleged misrepresentation, but also the relief sought by the plaintiff." *Schaaf v. Residential Funding Corp.*, Civ. No. 05-1319 (JNE/SRN), 2006 WL 2506847, at *16 (D. Minn. Aug. 29, 2006) (quotations omitted).

The moving Defendants argue that Plaintiffs' MCFA claims must be dismissed because Plaintiffs have not pleaded any facts that show that their cause of action benefits the public.  (Solutions Mem. 29-31; Thompson Mem. 26-29.)  Specifically, Defendants argue that Plaintiffs have failed to adequately plead the public-benefit element because (1) they seek only damages and no equitable or injunctive relief; (2) their claims relate to one-on-one transactions; and (3) the SEC has already frozen the assets of Lawton, Paramount, and Crossroad so that there will be no further detriment to the public.  (*See* Solutions Mem. 30-31;

---

[7]    The moving Defendants do not contend that the interests in Paramount Plaintiffs' purchased are not "merchandise" within the meaning of the MCFA.

Thompson Mem. 28-29.)  Plaintiffs argue that their allegations that the moving

Defendants were all engaged in a scheme to defraud investors sufficiently pleads

the public-benefit component of their Private AG Statute claims because such

"consumer scams undermine the credibility of our entire private investment

community," and that the SEC's decision to freeze some Defendants' assets

"highlight[s] the depth of the public interest" in this action.  (Pls.' Resp. 42.)

This Court concludes that Plaintiffs' MCFA claims brought under the

Private AG Statute must be dismissed because they have not sufficiently alleged

facts that demonstrate that their action will benefit the public.  Here, even though

schemes to defraud investors may erode confidence in private securities

markets, Plaintiffs do not allege that the misrepresentations Defendants made

were communicated to the public at large.  *See Collins v. Minn. Sch. of Bus.,

Inc.*, 655 N.W.2d 320, 330 (Minn. 2003) (concluding that the plaintiffs sufficiently

demonstrated public benefit when they showed that the defendant

misrepresented the nature of a school program to the "public at large"); *King v.

Reed, LLC*, Civ. No. 07-1908 (DWF/RLE), 2008 WL 80630, at *4 (D. Minn. Jan.

8, 2008) (interpreting *Collins* to require misrepresentations to be made to the

public at large); *Flora v. Firepond*, 260 F. Supp. 2d 780, 788 (D. Minn. 2003)

(same).  Also, even though Plaintiffs have alleged that this case involved more

than a single transaction where misrepresentations were made on a one-on-one

basis, as was the case in *Ly*, 615 N.W.2d at 314, the multiple transactions that

Plaintiffs allege here "were limited to a finite group of" potential and existing

investors and took place "directly between" Defendants and those investors. *Flora*, 260 F. Supp. 2d at 788.

Further, although Plaintiffs seek relief for a number of investors, "the benefit that will result, if they succeed, will accrue to the exclusive benefit of those individual investors because the 'redress' sought is 'to compensate Plaintiffs for their injuries.'" *Schaaf*, 2006 WL 2506974, at *16 (citing *Pecarina v. Tokai Corp.*, Civ. No. 01-1655 (ADM/AJB), 2002 WL 1023153, at *5 (D. Minn. May 20, 2002) (dismissing MCFA claim, in part, because the relief sought would only compensate the parents of injured children for their personal injuries)). And the fact that the SEC has frozen the assets of Paramount, Lawton, and Crossroad means that this case does not involve a product that is still on the market, thus further suggesting that the public will not benefit from Plaintiffs' claims. *See Zutz v. Case Corp.*, No. Civ. 02-1776 (PAM/RLE), 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003) (observing that the fact that a case involves a product that is still on the market weighs in favor of finding that a claim benefits the public). For these reasons, this Court concludes that Plaintiffs have failed to allege facts that plausibly suggest their MCFA claims brought under the Private AG Statute will benefit the public, and Defendants motions to dismiss Count IV of the Second Amended Complaint should be granted.

## VII. Unjust Enrichment Claims (Count V)

In Count V of the Second Amended Complaint, Plaintiffs assert a claim for unjust enrichment that is premised on the moving Defendants' alleged fraud and

misrepresentations.  (SAC ¶¶ 72-75.)  "Unjust enrichment is an equitable doctrine used to prevent a defendant from wrongfully benefiting from fraud, mistake or moral wrongdoing against the plaintiff."  *Meyer v. Dygert*, 156 F. Supp. 2d 1081, 1089 (D. Minn. 2001).  Under Minnesota law "[a] party is unjustly enriched when it knowingly receives something of value that it was not entitled to under circumstances that make it unjust for the party to retain the benefit."  *Ehlen v. Hanratty & Assoc., Inc.*, No. A08-2290, 2009 WL 3255399, at *6 (Minn. Ct. App. Oct. 13, 2009).  "Unjust enrichment requires unjust or illegal conduct."  *Id.*  "'An action for unjust enrichment may be based on failure of consideration, fraud, mistake and situations where it would be morally wrong for one party to enrich himself at the expense of another.'"  *Auntie Ruth's Furry Friends' Home Away From Home, Ltd.* v. *GCC Prop. Mgmt., LLC*, No. A08-1602, 2009 WL 2926485, at *7 (Minn. Ct. App. Sept. 15, 2009) (emphasis removed) (quoting *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984)).

Thompson argues that the rights of the parties in this action are governed by the Fourth Amended and Restated Limited Partnership Agreement and the Private Placement Memorandum, and because the relationship between Plaintiffs and Thompson is "purely contractual, Plaintiffs cannot state a claim for unjust enrichment as a matter of law."  (Thompson Mem. 30.)  CSM and CSD similarly argue that they are entitled to receive fees or compensation in connection with Paramount through the limited-partnership agreements, and that the Second Amended Complaint contains no facts indicating that they received

payments that were not authorized by contract. (Solutions Mem. 32.) And

Redpath and Bozora contend that Plaintiffs have not alleged that they conferred

a benefit on either Redpath or Bozora at all, "let alone any improper benefit."

(*Id.*) Plaintiffs argue "that any benefits realized by the Defendants as a result of

their involvement in the alleged scheme to market the Paramount fund through

fraud or material omissions would be benefits conferred by the plaintiffs on the

defendants." (Pls.' Resp. 43 (quotations and citations omitted).) In addition,

Plaintiffs argue that Defendants cannot hide behind the Limited Partnership

Agreements in this matter because those contracts were obtained through fraud.

(*Id.*)

Because this Court has concluded that Plaintiffs have adequately stated

securities-fraud claims against the moving Defendants, Plaintiffs have adequately

alleged that any funds those individuals received as a result of that fraud were

obtained unlawfully. *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504

(Minn. 1981) ("[U]njust enrichment claims do not lie simply because one party

benefits from the efforts or obligations of others, but instead it must be shown

that a party was unjustly enriched in the sense that the term unjustly could mean

illegally or unlawfully."). Plaintiffs' claim of unjust enrichment is clearly premised

on the notion that its invocation would "prevent . . . defendant[s] from wrongfully

benefiting from [their] fraud." *See Meyer*, 156 F. Supp. 2d at 1089. Defendants'

argument that CSM and CSD received fees and commissions pursuant to the

Limited Partnership Agreements and provisions of the Private Placement

Memoranda (and it can be reasonably inferred from the way those entities were organized that Thompson, Bozora, and Redpath benefited from those payments as well), utterly disregards the fact that Plaintiffs have alleged these contracts were procured through fraud. If fraud is proven, then the moving Defendants would have been enriched through illegal or unlawful means. Therefore, any benefits conferred on Defendants through the allegedly fraudulently induced investments are plausibly recoverable through the unjust-enrichment claim. Under these circumstances, this Court concludes that Defendants' motions to dismiss Count V of the Second Amended Complaint should be denied.

## VIII. Breach of Fiduciary Duty Claims – Counts VI and VIII

In Count VI of the Second Amended Complaint, Plaintiffs assert a claim for breach of the fiduciary duty of a financial planner against the moving Defendants. (SAC ¶¶ 83-89.) This claim is premised on the notion that the moving Defendants held themselves out to Plaintiffs as investment advisors or financial planners within the meaning of Minn. Stat. § 45.026, subd. 1, to induce Plaintiffs to invest in Paramount, and that the moving Defendants breached their duty to use reasonable care in providing that investment advice. (*Id.* ¶ 84.) In Count VIII of the Second Amended Complaint, Plaintiffs assert that all Defendants (except Paramount) owed Plaintiffs a fiduciary duty by virtue of being the general partner of Paramount or by controlling the general partner. (*Id.* ¶ 92.) Plaintiffs allege that all Defendants breached that fiduciary duty by failing to inform and advise Plaintiffs of misrepresentations and omissions regarding the operation of the

hedge fund, which caused Plaintiffs to lose the amount of their investments and other funds.  (*Id.* ¶ 93-94.)

### *Financial-Planner-Fiduciary-Duty Claim – Count VI*

With respect to Count VI, CSM, CSD, Redpath, and Bozora argue that: (1) Plaintiffs failed to allege that CSM is a broker-dealer of securities; and (2) Plaintiffs have not alleged that Redpath and Bozora held themselves out to be financial planners in any "advertisements" Plaintiffs received from them. (Solutions Mem. 33.)  Thompson argues that Count VI should be dismissed because Plaintiffs offer no factual basis to support the assertion that Thompson held himself out to be a financial planner.  (Thompson Mem. 30-31.)

"Persons who represent that they are financial planners have a fiduciary duty to persons for whom services are performed for compensation."  Minn. Stat. § 45.026, subd. 2.  Financial planners are persons who indicate that they are planners, counselors, or advisers of finances or investments, or who make similar representations in "advertisements, cards, signs, circulars, letterheads, or in another manner."  *Id.* § 45.026, subd. 1(b).[8]  Under Minnesota law, "'when confidence is reposed on one side and there is a resulting superiority and influence on the other,' a fiduciary relation exists."  *Buscher v. Brown & Brown, Inc.*, No. A08-1813, 2009 WL 259937, at *2 (Minn. App. Aug. 25, 2009) (quoting

---

[8]     In the twenty three years that this statute has been in effect in Minnesota, the Minnesota Courts, surprisingly, have never interpreted it.

*Stark v. Equitable Life Assurance Soc'y of United States*, 285 N.W. 466, 470 (Minn. 1939)).

Plaintiffs have alleged that Thompson, Bozora, and Redpath provided some of them with advice regarding whether they should be making investments in Paramount as opposed to other investment opportunities.  (*See* Am. Compl. ¶¶ 27(a)-(y) (explaining that one or other of these Defendants were acting as an investment adviser for matters relating to each Plaintiff's investments in Paramount).)  Although Plaintiffs have not alleged that the moving Defendants presented Plaintiffs with "cards, signs, circulars, or letterheads" indicating that each had a job title such as "'financial counselor,' 'financial adviser,' 'investment counselor,' 'investment adviser,' 'financial consultant,' or other similar designation, title or combination," *see* Minn. Stat. § 45.026, subd. 1(b), Plaintiffs have discussed in great detail the manner in which their investments in Paramount were solicited by the moving Defendants.  Minnesota's statute defining who is a "financial planner" includes *oral* statements among the "advertisements" through which an individual can represent that he or she is a person who advises others about investment or finances.  *See id.* § 45.026, subd. 1(c)(4) ("Advertisement includes . . . statements, written *or oral*, by a financial planner.") (emphasis added).  This Court concludes that Plaintiffs have met the pleading requirements for this claim, and therefore recommends that the moving Defendants' motions to dismiss should be denied accordingly .

### Partnership-Fiduciary-Duty Claim – Count VIII

The moving Defendants contend that Plaintiffs have failed to state a claim for breach of a partnership fiduciary duty because Plaintiffs' claims are of a type that must be brought derivatively rather than in an individual action. (Solutions Mem. 33-34; Thompson Mem. 31-32.)[9] Partners in a limited partnership have a fiduciary duty to one another. *Appletree Square I Ltd. P'ship v. Investmark, Inc.*, 494 N.W.2d 889, 892 (Minn. Ct. App. 1993). "When determining if an action must be brought derivatively or if it may be maintained as an individual action, the court must analyze the injury alleged in the complaint." *Buckley v. Control Data Corp.*, 923 F.2d 96, 98 (8th Cir. 1991) (quotation and alteration omitted). If the partnership suffers the harm directly, and the individual partners suffer only an indirect harm, such as that experienced through a decrease in the value of their shares' value, then the limited partners must bring any claim based on such an injury derivatively. *Id.*; *see also Spiegel v. Besikof*, No. C4-95-958, 1995 WL 697559, at *2 (Minn. Ct. App. Nov. 28, 1995) ("To determine whether limited partners have standing to bring an action directly or whether they must bring it derivatively, the court must analyze the alleged injury to see if it is an individualized harm, separate and distinct from the harm to the limited

---

[9]     The moving Defendants argue that Plaintiffs have failed to state a claim because Plaintiffs have not alleged sufficient facts to demonstrate that they controlled Paramount's general partner Crossroad. (Solutions Mem. 33; Thompson Mem. 31.) As noted above, Plaintiffs have adequately pleaded facts to demonstrate that the moving Defendants were controlling persons of Paramount's general partner Crossroad. Therefore, the moving Defendants' argument fails.

partnership.").  To bring an individual action, the injury the limited partners allege that they suffered must be "'separate and distinct' from any injury to the partnership."  *Id.* (referring to the separate and distinct injury as a "special injury") (alteration omitted).

The moving Defendants contend that the injury Plaintiffs allege here is the same injury suffered by the partnership as a whole: that is, the injury to the partnership that resulted from Paramount and Lawson's misappropriation of funds.  (Solutions Mem. 34; Thompson Mem. 32.)  Plaintiffs argue that their injuries are separate and distinct from the injury suffered by the partnership as a whole because certain investors in Paramount received income on their investments while others were left with nothing due to misappropriation of the partnership's funds.  (Pls.' Resp. 45.)  Plaintiffs also contend that their claims need not be brought derivatively because their injuries arise from Defendants' fraud in soliciting the Plaintiffs' investments in Paramount rather than from a fraud that affected all investors equally.  (*Id.* at 46.)

The moving Defendants rely on *Spiegel* to support their argument that the injury alleged here is not separate and distinct from the injury suffered by the partnership as a whole.  In *Spiegel*, the plaintiffs, investors in a limited partnership, alleged that one defendant, a certified public accountant, committed fraud by failing to disclose that he received kickbacks in the form of administrative fees in exchange for inducing investors to purchase partnership shares.  1995 WL 687559, at *1.  The plaintiffs also alleged that the general

partners of the limited partnership breached their fiduciary duties to their co-partners by "mismanag[ing] the partnership . . . that eventually caused their investments to become worthless." *Id.* On appeal from the district court's grant of summary judgment on their fiduciary-duty claim, the Minnesota Court of Appeals concluded that "the alleged breach of the fiduciary duty by the general partners [was] not a separate and distinct injury, but was suffered, if at all, by the partnership as a whole." *Id.* at *2. Thus, if the injury Plaintiffs suffered here is simply characterized as the loss of the value of their limited-partnership interests, such injuries have been treated as injuries to the partnership as a whole rather than separate and distinct injuries to the limited partners individually. *See Spiegel*, 1995 WL 697559, at *2; *Buckley*, 923 F.2d at 98. However, these cases do not stand for the broader proposition that limited partners may never bring a direct action for breach of the fiduciary duty owed to them. (*See* Thompson Reply 10 (mischaracterizing the holding of *Spiegel* as follows: "that limited partners lack standing to pursue individual claims").)

Plaintiffs argue that if a limited partner "'alleges fraud in the inducement to enter into the partnership agreement, the claim is generally individual in nature[.]'" (Pls.' Resp. 46 (quoting 59A Am. Jur. 2d *Partnership* § 898 (2009).) The authority that Plaintiffs cite in turn relies on *Golden Tee v. Venture Golf Schools*, 969 S.w.2d 625 (Ark. 1998), in which the Arkansas Supreme Court stated that "[f]raud is a cause of action that may be brought individually or as a derivative suit, depending on the allegations [and] [i]f the plaintiff alleges fraud in

the inducement to enter into the partnership agreement, the claim is generally individual in nature." *Id.* at 632 (citing 4 Alan R. Bromberg and Larry E. Ribstein on Partnership § 15.04(f), at 15:32 (1997)). The court concluded that because the plaintiff "alleges fraud in the inducement, [the] claim for fraud may be plead individually." *Id.*

As in *Golden Tee*, here Plaintiffs allege that the moving Defendants induced them to enter into the partnership agreement by making material misrepresentations about the partnership's management and handling of partnership assets. *See id.* ("As its first contention of fraud on appeal, Golden Tee alleges that appellees induced it to enter into the partnership agreement by fraudulently misrepresenting [another limited partner's] management and depreciation projections."). Defendants have alerted this Court to no precedent, and this Court has found none, that indicates that the decision in *Golden Tee* is contrary to Minnesota law. Therefore, this Court concludes that Plaintiffs do not lack standing to assert their breach-of-fiduciary-duty claim in a direct action against the moving Defendants, and the moving Defendants' motion to dismiss Count VIII should be denied.

## VIII.  Negligence Claims

In Count VII of the Second Amended Complaint, Plaintiffs assert a negligence claim against the moving Defendants. Specifically, Plaintiffs assert that they are claiming that the moving Defendants "were negligent in providing investment advice and monitoring functions." (Pls.' Resp. 46.) "Negligence

consists of a departure from a standard of conduct required by the law for the protection of others against unreasonable risk of harm." *Elder v. Allstate Ins. Co.*, 341 F. Supp. 2d 1095, 1099 (D. Minn. 2004) (citing *Seim v. Garavalia*, 306 N.W.2d 806, 810 (Minn. 1981)).  To state a plausible claim of negligence under Minnesota law, a plaintiff must plead sufficient factual content regarding four essential elements: (1) the existence of a duty of care; (2) breach of that duty; (3) that an injury was sustained; and (4) that the breach of duty was the proximate cause of the injury.  *See Ansari v. NCS Pearson, Inc.*, Civ. No. 08-5351 (JRT/JJG), 2009 WL 2337137, at *4 (D. Minn. July 23, 2009) (citing *State Farm Fire & Cas. Co. v. Aquila, Inc.*, 718 N.W.2d 879, 887 (Minn. 2006)).  "A legal duty is defined as an obligation under the law to conform to a particular standard of conduct towards another." *Guin v. Brazos Higher Educ. Serv. Corp., Inc.*, No. Civ. 05-668 (RHK/JSM), 2006 WL 288483, at *3 (D. Minn. Feb. 7, 2006) (citing *Minneapolis Employees Ret. Fund v. Allison-Williams Co.*, 519 N.W.2d 176, 182 (Minn. 1994)).  The Minnesota Supreme Court has defined the proximate-cause element as follows:

> For negligence to be the proximate cause of an injury, it must appear that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, then he is liable for any injury proximately resulting from it, even though he could not have anticipated the particular injury which did happen.

*Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 113 (Minn. 1992).

Thompson argues that Plaintiffs have done nothing more than provide a mere recitation of the elements of a negligence claim and have, thus, failed to provide any factual content on which this Court could conclude that Thompson's "pre-sale representations" proximately caused Plaintiffs' investment losses. (Thompson Mem. 32.)   CSM, CSD, Redpath, and Bozora argue that Plaintiffs have failed to allege the duty of care that they owed to Plaintiffs, how these Defendants breached any standard of care, and how any alleged breach proximately caused their losses.  (Solutions Mem. 34-36.)[10]  Plaintiffs argue, on the other hand, that the moving Defendants misconstrue Plaintiffs' negligence claims, which are premised on the moving Defendants' provision of investment advice and their responsibilities for monitoring the performance of the hedge fund.  (Pls.' Resp. 46-47.)

This Court concludes that Plaintiffs have adequately pleaded negligence claims against the moving Defendants.  The Second Amended Complaint contains sufficient factual allegations to support a reasonable inference that the moving Defendants owed Plaintiffs a legal duty as financial planners.  There is also sufficient factual content to support an inference that the moving Defendants breached that standard of care by providing false information to Plaintiffs, or by

---

[10]    CSM, CSD, Redpath, and Bozora also argue that the negligence claims of any individual who has not alleged that he ever met with Redpath or Bozora must be dismissed.  (Solutions Mem. 34-35.)  However, this Court interprets the Second Amended Complaint to merely be joining these claims with those Plaintiffs' negligence claims who did meet with these individuals.

failing to monitor Plaintiffs' investments as the moving Defendants represented they would. Plaintiffs also have alleged that they suffered an injury and they have presented sufficient factual content from which it is reasonable to infer that the moving Defendants' asserted breach of the duty owed to Plaintiffs was the proximate cause of such injury.[11] Therefore, this Court recommends denying the moving Defendants' motion to dismiss Count VII.

## X.    Punitive Damages Claims

Finally, the moving Defendants also seek dismissal of Plaintiffs' claim for punitive damages because Plaintiffs failed to follow the procedure for asserting a claim for punitive damages established in Minn. Stat. § 549.191. (Solutions Mem. 36; Thompson Mem. 33.) Plaintiffs agree that they did not follow this procedure and voluntarily withdraw their request for punitive damages found in the Second Amended Complaint's prayer for relief. (Pls.' Resp. 48 n.10.) Plaintiffs' claim for punitive damages should, therefore, be dismissed without prejudice.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1.    Defendant Charles T. Thompson's Motion to Dismiss Second Amended Complaint (Doc. No. 27), and Defendants' Michael W. Boroza's,

---

[11] This Court's conclusions regarding Plaintiffs' allegations of "loss causation" in the context of Plaintiffs' Section 10(b) and Rule 10b-5 claims addresses the issues the moving Defendants raise with respect to proximate cause in the negligence context.

Timothy Redpath's, Capital Solutions Distributors, LLC's, and Capital Solutions Management, LP's, Amended Motion to Dismiss (Doc. No. 28), be **GRANTED IN PART** and **DENEID IN PART** as follows:

a.     The Section 12(a)(1) claims in Count I of the Second Amended Complaint of Plaintiffs Ellen DeHaven, John Gardiner, John Gardiner as custodian for Max A. Gardiner, John Gardiner as custodian for Paige M. Gardiner, John Gardiner as custodian for Jake W. Gardiner, Steven R. Gulbrandsen, Steven R. Gulbrandsen Profit Sharing Plan, Blake Johnsno, LLC, R. Thomas Lane, Craig Mander, Guy M. Peterson, Jeffrey M. Petrik, Sally Petrik, Joseph H. Ryan, Sandra M. Ryan, Robert Spodafora, Thomas C. Weekly, IRA, and Daniel White should be dismissed as time-barred;

b.     The Section 12(a)(2) claims in County II of the Second Amended Complaint of Plaintiffs Stephen R. Gulbrandsen, Stephen R. Gulbrandsen Profit Sharing Plan, and Thomas C. Weekly should be dismissed as time-barred;

c.     The Section 10(b) and Rule 10b-5 claims in Count II of the Second Amended Complaint of Plaintiffs Stephen R. Gulbrandsen and Thomas C. Weekly should be dismissed as time-barred;

d.     Count IV of the Second Amended Complaint should be dismissed for failure to state a claim under the Minnesota Consumer Fraud Act;

e.     Plaintiffs' claim for punitive damages should be dismissed

without prejudice; and

f.     The motions should be denied in all other respects.


Date: March 1, 2010

 _s/ Jeffrey J. Keyes_
JEFFREY J. KEYES
United States Magistrate Judge

Under Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties on or before **March 15, 2010**, with a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within fourteen days of receipt of the Report.